# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **WILLIAM C. GARDNER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:12CV1573 LMB** |
| | ) | |
| **CAROLYN W. COLVIN,**[1] | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of William C. Gardner for Supplemental Security Income under Title XVI of the Social Security Act.  This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff filed a Brief in support of the Complaint.  (Doc. No. 13).  Defendant filed a Brief in Support of the Answer.  (Doc. No. 18).  Plaintiff filed a Reply. (Doc. No. 19).

## Procedural History

On September 14, 2010, plaintiff filed an application for Supplemental Security Income,

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this suit.  No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

claiming that he became unable to work due to his disabling condition on May 1, 2008.[2]  (Tr. 140-43).  This claim was denied initially and, following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated May 24, 2012.  (Tr. 82, 20-29).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on August 3, 2012.  (Tr. 1-5).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

**A.**   **ALJ Hearing**

Plaintiff's administrative hearing was held on March 2, 2012.  (Tr. 37).  Plaintiff was present and was represented by counsel.  (Id.).  Also present was vocational expert Linda Tollie.  (Id.).

The ALJ examined plaintiff, who testified that he stopped using marijuana January 10, 2012.  (Tr. 41).  The ALJ stated that he questioned how plaintiff's condition worsened after he stopped abusing marijuana.  (Tr. 42).  The ALJ noted that marijuana can cause depression and anxiety.  (Id.).

Plaintiff testified that he had not worked and had lived off of his father for twenty years.  (Tr. 43).  Plaintiff stated that he had never married, and he had a twenty-year-old daughter.  (Id.).  Plaintiff testified that his daughter's mother supported his daughter.  (Id.).

Plaintiff testified that he naps because he is tired all the time.  (Tr. 44).

Plaintiff stated that he last saw Dr. Mirela Marcu two weeks prior to the hearing.  (Id.).

---

[2]Plaintiff subsequently amended his alleged onset date to October 20, 2010.  (Tr. 41).

Plaintiff testified that he typically sees Dr. Marcu every two to four weeks.  (Tr. 45).  Plaintiff stated that Dr. Marcu spends about fifteen minutes with him each visit, during which time she counsels him and adjusts his medications.  (Id.).  Plaintiff testified that he also sees a counselor, Timothy Gerzowski.  (Id.).

Plaintiff stated that he was taking his medications as prescribed.  (Tr. 46).  Plaintiff testified that he stopped smoking marijuana in January of 2012 "cold turkey."  (Id.).

Plaintiff stated that he was no longer laying carpet, and that he last did this seven years prior to the hearing.  (Id.).  Plaintiff testified that he was paid cash to lay carpet.  (Id.).

Plaintiff stated that he did not know whether he was taking naps due to his medications. (Tr. 47).  Plaintiff testified that his doctor prescribed Ambien[3] to help him sleep better at night, but it was not effective.  (Id.).

Plaintiff's attorney examined plaintiff, who testified that he felt "pretty much the same," since he stopped using marijuana, although the marijuana helped with his anxiety.  (Tr. 48). Plaintiff stated that the marijuana allowed him to relax, and he now tended to dwell on things more.  (Id.).

Plaintiff testified that he used marijuana five times a day every day in 2011.  (Id.).  Plaintiff stated that his father paid for the marijuana, which cost about $40.00 a week.  (Tr. 49).  Plaintiff testified that he was always open about his marijuana use with Dr. Marcu.  (Tr. 50).  Plaintiff stated that Dr. Marcu told him it was good that he stopped using the marijuana.  (Id.).  Plaintiff testified that he occasionally goes to AA meetings.  (Id.).  Plaintiff stated that Timothy from

---

[3]Ambien is indicated for the treatment of insomnia.  See Physician's Desk Reference ("PDR"), 2693 (63rd Ed. 2009).

Community Alternatives picks him up and takes him to meetings.  (Tr. 51).

Plaintiff testified that he tried to stop using marijuana one year prior to the hearing, and he quit for approximately one month at that time.  (Id.).  Plaintiff stated that it was difficult for him to stop using marijuana, and he felt anxious for about two weeks after he quit.  (Tr. 52). Plaintiff testified that he was taking Klonopin,[4] Latuda,[5] Cymbalta,[6] and Ambien at the time of the hearing.  (Tr. 53).  Plaintiff stated that he felt that this combination of medications was working better than the last combination of medications.  (Id.).  Plaintiff testified that he was always moving when he was taking his prior medications.  (Id.).

Plaintiff stated that he has difficulty concentrating and difficulty being around people in social settings.  (Tr. 54).  Plaintiff testified that he experiences panic attacks and shortness of breath when he goes to the grocery store.  (Id.).  Plaintiff stated that he does not go to Church, or belong to any clubs.  (Id.).  Plaintiff testified that he does not like to go to AA meetings by himself, so Timothy goes with him.  (Id.).  Plaintiff stated that friends do not come over to his house for parties, and he does not attend parties at other places.  (Id.).  Plaintiff testified that he has been bowling twice in the past three months.  (Tr. 55).

Plaintiff stated that Timothy from Community Alternatives takes him bowling, and that this was going "pretty good."  (Id.).  Plaintiff testified that Timothy provides talk therapy and gives him objectives for the week.  (Id.).  Plaintiff stated that his objectives include things like

---

[4]Klonopin is indicated for the treatment of panic disorder.  See PDR at 2639.

[5]Latuda is indicated for the treatment of schizophrenia.  See WebMD, http://www.webmd.com/drugs (last visited September 5, 2013).

[6]Cymbalta is indicated for the treatment of major depressive disorder and generalized anxiety disorder.  See PDR at 1801.

exercising and mediating.  (Id.).  Plaintiff testified that he exercises and meditates about once a week.  (Tr. 56).  Plaintiff stated that Timothy usually calls him on each Friday, and that he also sees him in the Community Alternatives office occasionally.  (Id.).

Plaintiff testified that he has difficulty concentrating.  (Id.).  Plaintiff stated that he becomes frustrated when he tries to read and he has to stop.  (Tr. 57).

Plaintiff testified that he enjoys fishing.  (Id.).  Plaintiff stated that he goes fishing with his father, and that he feels comfortable around his father.  (Id.).  Plaintiff testified that his father occasionally accompanies him to doctor appointments.  (Id.).

Plaintiff stated that he has a driver's license, and that he occasionally drives to the lake when he goes fishing with his father.  (Tr. 58).

Plaintiff testified that he takes out the trash and his father does the remainder of the household chores.  (Tr. 59).  Plaintiff stated that he cooks about once a month, otherwise his father cooks.  (Id.).  Plaintiff testified that his father is retired.  (Id.).

The ALJ re-examined plaintiff, who testified that he picks up after himself, cleans the bathroom that he uses, and empties the dishwasher.  (Id.).  Plaintiff stated that he lives in a one-story house.  (Id.).  Plaintiff testified that he does his own laundry.  (Tr. 60).  Plaintiff testified that he does not do more household chores because he is "just not a cleaning person."  (Id.).  Plaintiff stated that he cuts the grass.  (Id.).  Plaintiff testified that he has two dogs, and that he takes care of them.  (Tr. 61).

Plaintiff stated that he watches television shows and movies.  (Id.).

Plaintiff testified that his daughter comes over to his home to visit, and that he has a "pretty good" relationship with her.  (Tr. 62).  Plaintiff stated that he gets along "fine" with his

- 5 -

daughter's mother.  (Id.).  Plaintiff testified that he does not socialize with the friends who used to

get him marijuana.  (Id.).

Plaintiff testified that he has lived with his father most of his life.  (Tr. 63).  Plaintiff stated

that his parents were married and lived together prior to his mother's death.  (Id.).

Plaintiff stated that he goes fishing with his father one to two times a month during the

summer.  (Id.).  Plaintiff stated that he enjoys driving around in his truck, and would do this if gas

prices were not so high.  (Tr. 64).

Plaintiff testified that he drank a lot of alcohol in the past.  (Id.).

Plaintiff stated that he worked as a forklift driver and a laborer at a warehouse in 2007 and

2008.  (Tr. 65).

Plaintiff testified that he worked as a magazine distributor through a temp service for three

months in 2005.  (Tr. 66).  Plaintiff stated that he quit working for the temp service because the

position was not what he "was looking for."  (Tr. 67).  Plaintiff testified that the job was too

physically demanding, and that he had to lift seventy-pound boxes of siding.  (Id.).

The ALJ examined vocational expert Linda Tollie, who testified that plaintiff's past work

is classified as follows: forklift driver (semi-skilled, medium); warehouse worker (unskilled,

medium); assembly production (unskilled, light); and hand packager (unskilled, medium).  (Tr.

71).  Ms. Tollie stated that plaintiff performed the hand packager position at the heavy level.  (Tr.

72).

The ALJ asked Ms. Tollie to assume a hypothetical claimant with plaintiff's background

and the following limitations: routine, repetitive work; low-stress job, involving only occasional

decision-making and occasional changes in the work setting; occasional judgment; and occasional

interaction with co-workers, supervisors, and the general public.  (Tr. 73).  Ms. Tollie testified

that the individual would be capable of performing plaintiff's past assembler production, hand

packager, and warehouse worker positions.  (Id.).  Ms. Tollie stated that the individual would also

be capable of performing other work, such as dipper (90,000 positions nationally, 1,900 in

Missouri); and dishwasher (500,000 positions nationally, 10,000 in Missouri).  (Tr. 75).

Ms. Tollie testified that an individual who was absent twice a month would be unable to

sustain employment.  (Tr. 77).

Ms. Tollie testified that all of the positions she mentioned, including plaintiff's past work,

would require the individual to stay on task at least eighty-five percent of the time.  (Id.).

Ms. Tollie stated that all of the jobs she discussed have some type of production quota.

(Tr. 78).  Ms. Tollie testified that there are positions that would have a production quota based on

the end of the work day and would not require a fast pace.  (Tr. 79).  Ms. Tollie stated that such

positions include linen room attendant (600,000 positions nationally, 5,000 in Missouri); and

housekeeper (60,000 positions nationally, 1,500 in Missouri).  (Tr. 80).

**B.**     **Relevant Medical Records**

The record reveals plaintiff saw psychiatrist Mirela Marcu, M.D., on a regular basis

beginning in August 2008.  (Tr. 347-65,196-212).  On August 5, 2008, Dr. Marcu diagnosed

plaintiff with bipolar disorder type I,[7] and polysubstance abuse.  (Tr. 365).  She prescribed Abilify[8]

and Klonopin.  (Tr. 364).  Dr. Marcu saw plaintiff approximately monthly and adjusted his

---

[7]An affective disorder characterized by the occurrence of alternating (e.g., mixed, manic, and major depressive) episodes.  Stedman's Medical Dictionary, 568 (28th Ed. 2006).

[8]Abilify is an antipsychotic drug indicated for the treatment of bipolar disorder and major depressive disorder.  See PDR at 881.

medications.  (Tr. 347-65, 196-212).

Plaintiff was admitted to DePaul Health Center on December 16, 2009, after reporting

suicidal ideations.  (Tr. 223).  Plaintiff reported that he had been depressed since his mother died

recently, and was trying to kill himself by huffing freon and mouthwash.  (Id.).  Plaintiff was

discharged on December 18, 2009, with diagnoses of bipolar affective disorder type I, most recent

episode depressed without psychosis; heroin abuse; opioid abuse versus dependence; history of

cocaine and alcohol abuse; rule out antisocial personality disorder traits; and a GAF score of 52.[9]

(Tr. 219).  Plaintiff was prescribed Seroquel,[10] Klonopin, Prozac,[11] and Vicodin.[12]  (Id.).

Plaintiff was admitted to DePaul Health Center from December 29, 2009, through January

3, 2010, after his daughter called the police reporting that plaintiff was suicidal.  (Tr. 276).  Upon

admission, plaintiff was depressed, felt hopeless and helpless, and had problems with racing

thoughts, anger, and rage.  (Id.).  Plaintiff denied experiencing any suicidal or homicidal ideations

and reported that he was there because his daughter called the police.  (Id.).  Plaintiff was noted

to have a history of noncompliance with treatment.  (Id.).  Plaintiff was diagnosed with bipolar

affective disorder; history of substance abuse including cocaine abuse, opioid abuse, and alcohol

─────────────────

[9]A GAF score of 51 to 60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[10]Seroquel is an anti-psychotic drug indicated for the treatment of bipolar disorder and schizophrenia.  See WebMD, http://www.webmd.com/drugs (last visited September 5, 2013).

[11]Prozac is indicated for the treatment of major depressive disorder.  PDR at 1854.

[12]Vicodin is a narcotic analgesic indicated for the relief of moderate to moderately severe pain.  See PDR at 532.

abuse; and a GAF score of 20 to 30.[13]  (Tr. 277).

Plaintiff was hospitalized again at DePaul Health Center on January 5, 2010, after he was brought in by police secondary to suicidal ideation.  (Tr. 284).  Plaintiff's daughter reported to police that plaintiff had bought a firearm and stated "it's all gonna end this Friday."  (Id.).  Plaintiff reported that he was depressed due to the recent death of his mother.  (Id.).  Plaintiff indicated that he had missed a few appointments with Dr. Marcu and had run out of medication.  (Tr. 301).  Plaintiff reported using marijuana daily.  (Id.).  Upon examination, plaintiff was anxious and depressed, but had no suicidal ideas or homicidal ideas.  (Tr. 299).  Plaintiff was diagnosed with bipolar disorder and marijuana dependence, and was assessed a GAF score of 31-35.[14]  (Tr. 303).  Plaintiff was discharged on January 9, 2010, and was prescribed Seroquel and Prozac.  (Tr. 308).

Plaintiff saw Dr. Marcu on February 12, 2010, at which time Dr. Marcu stated that plaintiff had decompensated after his mother's death in December.  (Tr. 346).  Dr. Marcu indicated that plaintiff had recently completed a substance abuse treatment program, yet he continued to smoke marijuana.  (Id.).  Upon examination, plaintiff appeared withdrawn and

---

[13]A GAF score of 11 to 20 denotes "[s]ome danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."  DSM-IV at 32.  A GAF score of 21 to 30 indicates "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."  Id.

[14]A GAF score of 31 to 40 denotes "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work...)."  DSM-IV at 32.

blunted, he had no suicidal or homicidal ideations, and his insight and judgment were limited. (Id.).  Dr. Marcu diagnosed plaintiff with bipolar affective disorder with psychosis, and continued plaintiff's Prozac and Seroquel.  (Id.).  Plaintiff continued to see Dr. Marcu on a regular basis. (Tr. 334-45).

Dr. Marcu completed a Mental Medical Source Statement on August 4, 2010, in which she expressed the opinion that plaintiff had an extreme limitation in his ability to relate to family, peers, or caregivers.  (Tr. 330).  Dr. Marcu found that plaintiff had marked limitations in his ability to cope with normal stress, function independently, maintain reliability, accept instructions or respond to criticism, perform at a consistent pace without an unreasonable number and length of breaks, sustain an ordinary routine without special supervision, and respond to changes in work setting.  (Tr. 329-30).  Dr. Marcu found that plaintiff had moderate limitations in his ability to behave in an emotionally stable manner, adhere to basic standards of neatness and cleanliness, interact with strangers or the general public, ask simple questions or request assistance, maintain socially acceptable behavior, and maintain attention and concentration for extended periods.  (Id.). Dr. Marcu found that plaintiff was able to apply commonsense understanding to carry out simple one-or-two-step instructions, interact appropriately with co-workers, interact appropriately with supervisors, and interact appropriately with the general public for a total of zero to two hours during a workday.  (Tr. 331).  Dr. Marcu indicated that plaintiff would be absent three times a month or more due to his psychologically-based symptoms.  (Id.).  Dr. Marcu listed plaintiff's diagnoses as bipolar disorder and cannabinoid dependence.  (Tr. 332).

Plaintiff saw Dr. Marcu on September 10, 2010, at which time he appeared "a little better."  (Tr. 196).  Plaintiff's mood and his relationship with his father had improved.  (Id.).

- 10 -

Plaintiff was smoking marijuana but was making an effort to quit.  (Id.).  Dr. Marcu diagnosed

plaintiff with bipolar disorder and marijuana dependence.  (Id.).  On October 20, 2010, plaintiff

felt more agitated.  (Tr. 336).  Plaintiff was using marijuana every day.  (Id.).  Upon examination,

plaintiff was pleasant, and denied suicidal or homicidal intent.  (Id.).  Dr. Marcu increased

plaintiff's dosage of Geodon.[15]  (Id.).  On November 10, 2010, plaintiff reported a sad mood at

times, and difficulty sleeping.  (Tr. 394).  Plaintiff indicated that he felt the Geodon was working

except for the insomnia.  (Id.).  Plaintiff denied depression or psychosis.  (Id.).  Dr. Marcu

diagnosed plaintiff with bipolar affective disorder and marijuana dependence.  (Id.).  Dr. Marcu

increased plaintiff's Geodon, decreased his Prozac, discontinued the Seroquel, and prescribed

Klonopin and Trazodone.[16]  (Id.).

State agency psychologist Stephen Scher, Ph.D. completed a Psychiatric Review

Technique on November 24, 2010, in which he expressed the opinion that plaintiff had mild

limitations in his activities of daily living; and moderate limitations in his ability to maintain social

functioning and ability to maintain concentration, persistence, or pace.  (Tr. 374).  Dr. Scher also

completed a Mental Residual Functional Capacity Assessment, in which he found that plaintiff

was moderately limited in his ability to understand and remember detailed instructions; carry out

detailed instructions; work in coordination with or proximity to others without being distracted by

them; interact appropriately with the general public, accept instructions and respond appropriately

---

[15]Geodon is indicated for the treatment of schizophrenia and bipolar mania.  See PDR at
2521.

[16]Trazodone is an antidepressant drug indicated for the treatment of depression and other
mood disorders.  See WebMD, http://www.webmd.com/drugs (last visited September 5, 2013).

to criticism from supervisors; and get along with co-workers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 378-79).  Dr. Scher stated that plaintiff has the capacity to understand and remember simple instructions; sustain concentration, persistence, and pace on simple tasks; interact with co-workers, supervisors and the general public on a limited basis; and adapt in a simple work environment.  (Tr. 380).

On November 30, 2010, Dr. Marcu completed a second Mental Medical Source Statement, which was identical to the August 4, 2010 Mental Medical Source Statement.  (Tr. 388-91).

On January 12, 2011, plaintiff reported that he was feeling "ok," and that he was afraid to take the Trazodone.  (Tr. 393).  Plaintiff reported that the Geodon helped his moods.  (Id.).  Plaintiff continued to smoke marijuana.  (Id.).  Dr. Marcu continued plaintiff's medications.  (Id.).  On March 9, 2011, plaintiff reported feeling sleepy during the day, and a little on edge.  (Tr. 427).  He continued to smoke marijuana daily to relax.  (Id.).  Upon examination, plaintiff was pleasant, but a little difficult to engage, with monotone speech and a restricted affect.  (Id.).  On June 15, 2011, plaintiff reported that he had re-started his medications, continued to use marijuana, and was working with his father "a little more than in the past."  (Tr. 426).  Upon examination, plaintiff was pleasant, depressed, and had no suicidal or homicidal ideation.  (Id.).  On July 29, 2011, plaintiff reported that he had not been taking his medications in almost one month because he did not need them.  (Tr. 425).  Plaintiff denied major mood swings but continued to be very unmotivated.  (Id.).  Plaintiff continued to smoke marijuana.  (Id.).  Dr. Marcu encouraged plaintiff to start taking his medications again.  (Id.).  On October 10, 2011, plaintiff had not been seen in a while, and reported that he had run out of one of his medications.  (Tr. 423).  Plaintiff

reported mood swings, and continued to smoke marijuana daily.  (Id.).  On October 24, 2011,

plaintiff reported that he was taking his medication regularly because he feared that his symptoms

may return.  (Tr. 424).  Plaintiff was smoking marijuana almost daily, and complained of

decreased energy.  (Id.).  Dr. Marcu encouraged plaintiff to attend therapy and substance abuse

treatment.  (Id.).  On November 11, 2011, plaintiff reported that he felt depressed more than

usual.  (Tr. 421).  Plaintiff was using marijuana daily and tries to stop but he is not able to stop.

(Id.).  Upon examination, plaintiff was pleasant, his affect was sullen, and he denied suicidal or

homicidal ideation.  (Id.).  On November 28, 2011, plaintiff reported feeling lonely and depressed

over the Thanksgiving holiday.  (Tr. 422).  Plaintiff continued to smoke marijuana.  (Id.).  Upon

examination, plaintiff was pleasant, and had a constricted affect.  (Id.).  Dr. Marcu increased

plaintiff's dosage of Cymbalta and encouraged plaintiff to attend more group activities.  (Id.).  On

January 6, 2012, plaintiff reported feeling tired and depressed, but "not so bad."  (Tr. 420).

Plaintiff continued to smoke marijuana when it was available to him to help him with his anxiety.

(Id.).  Upon examination, plaintiff was pleasant and his affect was constricted.  (Id.).

On January 27, 2012, Dr. Marcu completed a Mental Status Exam, in which she noted

that plaintiff was clean, overweight, cooperative, aware, responsive, had slowed body movements,

slowed speech, was anxious, was depressed, had a constricted affect, his stream of thought was

logical and goal-directed, his memory was fair, and his insight and judgment were fair.  (Tr. 444-

46).  Dr. Marcu noted that plaintiff reported he stopped using marijuana seventeen days prior, and

he reported decreased sleep and increased appetite.  (Tr. 446).  Dr. Marcu diagnosed plaintiff

with schizoaffective disorder[17] and marijuana dependence in early remission, with a GAF score of 50.[18]  (Tr. 447).

Dr. Marcu completed a third Mental Medical Source Statement on January 30, 2012, in which she expressed the opinion that plaintiff had extreme limitations in his ability to behave in an emotionally stable manner; interact with strangers or the general public; and respond to changes in the work setting.  (Tr. 429-30).  Dr. Marcu found that plaintiff had marked limitations in his ability to cope with normal stress; maintain reliability; accept instructions or respond to criticism; maintain attention and concentration for extended periods; perform at a consistent pace without an unreasonable number and length of breaks; and sustain an ordinary routine without special supervision.  (Id.).  Dr. Marcu also found plaintiff had moderate limitations in his ability to function independently; adhere to basic standards of neatness and cleanliness; relate to family, peers, or caregivers; ask simple questions or request assistance; maintain socially acceptable behavior; and make simple and rational decisions.  (Id.).  Dr. Marcu expressed the opinion that plaintiff was able to apply commonsense understanding to carry out simple one-or-two-step instructions, interact appropriately with co-workers, interact appropriately with supervisors, and interact appropriately with the general public a total of zero to two hours in a workday.  (Tr. 431).  Dr. Marcu found that plaintiff would be absent three times a month or more due to his psychologically-based symptoms.  (Id.).

---

[17]An illness manifested by an enduring major depressive, manic, or mixed episode along with delusions, hallucinations, disorganized speech and behavior, and negative symptoms of schizophrenia.  Stedman's at 570.

[18]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 32.

## The ALJ's Determination

The ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since September 14, 2010, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: bipolar disorder and anxiety (20 CFR 416.920(c)).

3. The claimant doe not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is able to perform routine, repetitive work.  He is limited to a low stress environment, with "low stress" defined as involving only occasional decision-making and occasional changes in a work setting.  The claimant is limited to work that involves only occasional judgment and occasional interaction with the general public, co-workers and supervisors.

5. The claimant is capable of performing past relevant work as a warehouse worker, assembler, and hand packager.  This work does not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 416.965).

6. The claimant has not been under a disability, as defined in the Social Security Act, since September 14, 2010, the date the application was filed (20 CFR 416.920(f)).

(Tr. 22-29).

The ALJ's final decision reads as follows:

Based on the application for supplemental security income filed on September 14, 2010, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 29).

- 15 -

## Discussion

**A.     Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

**B.     Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I)(1)(a); U.S.C. § 423 (d)(1)(a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598,

601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of

- 17 -

whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of

medical findings and the rating of functional loss against the paragraph A and B criteria of the

Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the

impairment does not meet or equal the listings, then the Commissioner must prepare a residual

functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

**C.      Plaintiff's Claims**

Plaintiff first argues that the ALJ erred in evaluating the medical opinion evidence in

determining plaintiff's RFC.  Plaintiff next argues that the ALJ erred in failing to properly evaluate

plaintiff's marijuana dependence.  The undersigned will address plaintiff's claims in turn.

It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence,

including medical records, observations of treating physicians and others, and the claimant's own

description of her limitations.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001)

(quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).  A claimant's RFC is what he or

she can do despite his or her limitations.  20 C.F.R. § 404.1545.  It is the claimant's burden, and

not the Social Security Commissioner's burden to prove the claimant's RFC.  Pearsall, 274 F.3d

at 1218.

The ALJ made the following determination with regard to plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the
> claimant has the residual functional capacity to perform a full range of work at all
> exertional levels but with the following nonexertional limitations: the claimant is able to
> perform routine, repetitive work.  He is limited to a low stress environment, with "low
> stress" defined as involving only occasional decision-making and occasional changes in a
> work setting.  The claimant is limited to work that involves only occasional judgment and
> occasional interaction with the general public, co-workers and supervisors.

(Tr. 25).

Plaintiff first contends that the ALJ erred in discrediting the opinion of plaintiff's treating

psychiatrist, Dr. Marcu.  "A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'"  Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)).  However, "[w]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight."  Halverson v. Astrue, 600 F.3d 922, 929-30 (8th Cir. 2010) (internal quotation marks omitted).

"'When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so.'"  Martise v. Astrue, 641 F.3d 909, 925 (8th Cir. 2011) (quoting Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007)).  When an opinion is not given controlling weight as the opinion of a treating source, the weight given to the opinion depends on a number of factors, including whether the source has examined the claimant, the nature and extent of the treatment relationship, the relevant evidence provided in support of the opinion, the consistency of the opinion with the record as a whole, whether the opinion is related to the source's area of specialty, and other factors.  20 C.F.R. §§ 404.1527(c).

Dr. Marcu completed mental medical source statements in August 2010, November 2010, and January 2012.  (Tr. 329-32, 388-91, 429-32).  In each statement, Dr. Marcu found that plaintiff had some extreme limitations, and many marked and moderate limitations.  In her most recent mental medical source statement, dated January 30, 2012, Dr. Marcu expressed the opinion that plaintiff had extreme limitations in his ability to behave in an emotionally stable manner; interact with strangers or the general public; and respond to changes in the work setting.  (Tr. 429-30).  Dr. Marcu found that plaintiff had marked limitations in his ability to cope with normal

- 20 -

stress; maintain reliability; accept instructions or respond to criticism; maintain attention and concentration for extended periods; perform at a consistent pace without an unreasonable number and length of breaks; and sustain an ordinary routine without special supervision.  (Id.).  Dr. Marcu also found plaintiff had moderate limitations in his ability to function independently; adhere to basic standards of neatness and cleanliness; relate to family, peers, or caregivers; ask simple questions or request assistance; maintain socially acceptable behavior; and make simple and rational decisions.  (Id.).  Dr. Marcu expressed the opinion that plaintiff was able to apply commonsense understanding to carry out simple one-or-two-step instructions, interact appropriately with co-workers, interact appropriately with supervisors, and interact appropriately with the general public a total of zero to two hours in a workday.  (Tr. 431).  Dr. Marcu found that plaintiff would be absent three times a month or more due to his psychologically-based symptoms.  (Id.).

The ALJ indicated that she was assigning "little weight" to Dr. Marcu's opinions because they were not consistent with the totality of the evidence.  (Tr. 26).  The ALJ stated that plaintiff's condition appeared to improve with treatment.  (Id.).  The ALJ also noted that Dr. Marcu does not specifically indicate the consideration, if any, of plaintiff's substantial lack of compliance with prescribed treatment or his daily use of marijuana.  (Id.).

The undersigned finds that the ALJ gave legally sufficient reasons for her decision to grant little weight to Dr. Marcu's opinion, and that her decision to do so was supported by substantial evidence.  First, as the ALJ properly noted, Dr. Marcu cites no evidence in support of her findings.  (Tr. 24, 388-89).  Rather, Dr. Marcu completed a pre-printed check list provided to her by plaintiff's attorney, which contained no indication of the evidence supporting the findings.

- 21 -

(Tr. 388-89).  See Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) (finding that an ALJ

properly discounted an opinion in part because it was conclusory, consisted of checklist forms,

cited no medical evidence, and provided little to no elaboration); Holmstrom v. Massanari, 270

F.3d 715, 721 (8th Cir. 2001) (noting that the checklist format of an RFC assessment limited its

evidentiary value); SSR 06-03p (noting that the factors to be considered in weighing an opinion

include "the degree to which the source presents relevant evidence to support an opinion" and

"how well the source explains the opinion").

Second, Dr. Marcu's opinions are inconsistent with the record, including Dr. Marcu's own

treatment notes.  Dr. Marcu's treatment notes during the relevant period support the ALJ's

finding that plaintiff's condition appeared to improve with treatment.  For example, in November

2010, one month after his alleged onset of disability date, plaintiff reported that he felt his

medication was working, and denied depression or psychosis.  (Tr. 394).  In January 2011,

plaintiff reported that he was feeling "ok," and that his medication helped his moods.  (Tr. 393).

On June 15, 2011, plaintiff reported that he had re-started his medications, and was working with

his father.  (Tr. 426).  In July 2011, plaintiff reported that he did not need his medications, and

denied mood swings.  (Tr. 425).  In October 2011, plaintiff reported that he was taking his

medication regularly because he feared that his symptoms may return.  (Tr. 424).  Plaintiff

reported feeling lonely and depressed over the holidays in November 2011, but in January 2012,

plaintiff reported feeling "not so bad."  (Tr. 420).  Dr. Marcu consistently described plaintiff as

"pleasant" on examination.  (Tr. 336, 427, 426, 421, 422, 420).  This evidence does not support

the presence of extreme and marked limitations.  Further, although plaintiff cites his psychiatric

hospitalizations, these all occurred prior to his alleged onset of disability date, during a period

when he reported depression due to his mother's death.  (Tr. 223, 284).

Third, the ALJ indicated he assigned little weight to Dr. Marcu's opinions because Dr.

Marcu did not specifically acknowledge the impact of plaintiff's noncompliance or his daily use of

marijuana.  (Tr. 26).  The ALJ properly noted that plaintiff has a strong history of noncompliance

with recommended treatment, including missing scheduled appointments and not taking his

medications as prescribed.  (Tr. 26, 393, 426, 425, 423).  There is no indication that Dr. Marcu

considered plaintiff's noncompliance when expressing her opinions regarding plaintiff's work-

related limitations.  With regard to plaintiff's marijuana use, plaintiff notes that each statement Dr.

Marcu completed indicates that she considered drugs and alcohol and the limitations she found

would remain with sobriety.  While the pre-printed form Dr. Marcu completed did instruct the

author to describe only the limitations that would remain if the patient stopped using drugs or

alcohol, the ALJ has provided sufficient reasons for assigning little weight to Dr. Marcu's

opinions.

In sum, the ALJ was not required to give weight to Dr. Marcu's opinions that were

unsupported by her own treatment notes, and were inconsistent with her treatment notes and

other substantial evidence in the record.  See Juszcyk v. Astrue, 542 F.3d 626, 632 (8th Cir.

2008) ("ALJs are not obliged to defer to treating physician's medical opinions unless they are

'well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not

inconsistent with the other substantial evidence in the record.'") (quoting Ellis v. Barnhart, 392

F.3d 988, 995 (8th Cir. 2005)); Wildman, 596 F.3d at 964 (finding that the ALJ properly

discounted a treating physician's opinion that was conclusory, cited no medical evidence, and

provided little to no elaboration); Davidson v. Astrue, 578 F.3d 838, 843 (8th Cir. 2009) (stating, "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes," and affirming the ALJ's decision in part because the treating physician's treatment notes "contain[ed] few indications of the total disability [the doctor would later] attribute to [the plaintiff].").

Plaintiff also argues that the ALJ erred in assigning considerable weight to the opinion of non-examining state agency psychologist Dr. Scher.  Dr. Scher completed a Psychiatric Review Technique on November 24, 2010, in which he expressed the opinion that plaintiff had mild limitations in his activities of daily living; and moderate limitations in his ability to maintain social functioning, and ability to maintain concentration, persistence, or pace.  (Tr. 374).  Dr. Scher also completed a Mental Residual Functional Capacity Assessment, in which he found that plaintiff has the capacity to understand and remember simple instructions; sustain concentration, persistence, and pace on simple tasks; interact with co-workers, supervisors and the general public on a limited basis; and adapt in a simple work environment.  (Tr. 380).  The ALJ found that Dr. Scher's opinions are generally consistent with the record as a whole and accorded them "considerable weight."  (Tr. 27).

State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. 20 C.F.R. §§ 404.1527(e)(2)(I), 416.927(e)(2)(I).  In evaluating the opinion of the state agency physician, the ALJ will weigh the findings of the consultant using the relevant factors in paragraphs (a)

through (e) in 20 C.F.R. § 404.1527 and § 416.927, as the ALJ would in evaluating the opinions

of other medical sources.  Id.

The ALJ properly evaluated the opinion of Dr. Scher.  The ALJ indicated that Dr. Scher's

opinions were consistent with the record as a whole.  This finding is supported by the record.

As previously discussed, Dr. Marcu's treatment notes reveal that plaintiff's condition

improved with treatment.  In addition, plaintiff's testimony supports Dr. Scher's findings that

plaintiff has only mild limitations in his activities of daily living, and moderate limitations in his

ability to maintain social functioning, and ability to maintain concentration, persistence, or pace.

Plaintiff testified that he cleans up after himself; performs some household chores, including yard

work; watches television and movies; occasionally goes bowling or fishing, and enjoys these

activities; enjoys driving around in his truck, although he did not do this often due to the high

price of gas; and visits with his daughter.  (Tr. 55, 57, 61, 62, 64).  Plaintiff also testified that he

has a good relationship with his daughter and his daughter's mother.  (Tr. 62).  The record as a

whole supports Dr. Scher's findings.  Thus, the ALJ's determination that plaintiff is capable of

performing routine, repetitive work in a low stress environment with only occasional judgment

and occasional interaction with the general public, co-workers, and supervisors is supported by

substantial evidence on the record as a whole.

Plaintiff also contends that the ALJ erred in failing to properly evaluate plaintiff's

marijuana dependence under 20 C.F.R. § 416.935.

"An individual shall not be considered to be disabled [] if alcoholism or drug addiction

would (but for this subparagraph) be a contributing factor material to the Commissioner's

determination that the individual is disabled."  42 U.S.C. § 423(d)(2)(C).  When determining

whether alcoholism or drug addiction is a key factor, the ALJ is to decide which of a claimant's current physical and mental limitations, upon which the ALJ based his current disability determination, would remain if such abuse stopped and whether those remaining limitations would be disabling.  20 C.F.R. § 416.935(b)(2).  Thus, an ALJ need *not* evaluate the effect of a claimant's substance abuse on his or her physical and mental limitations if those limitations were not found first to be disabling.

In this case, the ALJ found as follows with regard to plaintiff's drug abuse:

> The undersigned finds that drug abuse is involved in this case, but the materiality of such drug abuse is not evaluated as the claimant appears to be quite able to complete simple tasks in which he has limited contact with others in the workplace in spite of his substance abuse, as shown by his daily activities.

(Tr. 27).  The ALJ did not find plaintiff's limitations to be disabling, even considering his marijuana abuse.  This finding is supported by the record, as discussed above.  Consequently, the ALJ did not need to determine the effect of plaintiff's drug abuse on his mental limitations.  See Brueggemann v. Barnhart, 348 F.3d 689, 693-94 (8th Cir. 2003) (discussing procedure to be followed when evaluating drug addiction or alcoholism and noting that a finding of disability precedes the application of the procedure).

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment.  Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

Dated this 23rd  day of September, 2013.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE